## Case No. 15,412.

UNITED STATES v. HUDSON.

[1 Hask. 527.] [1]

District Court, D. Maine. April, 1874.

NEW TRIAL — DEPUTY MARSHALS — PRESUMPTIONS FROM COMMISSION — "IRON CLAD OATH" — ARREST—BAIL—RESISTING OFFICER—INDICTMENT.

1. A new trial will not be granted because of the exclusion of the question by defendant's counsel to a government witness on cross examination, whether he had not testified to a specific fact on a former trial, when it appears that the defendant has not suffered wrong or prejudice thereby.

2. The production of a deputy marshal's commission and proof that he was in the performance of the duties of his office raises a pre-

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

sumption that he had taken all prerequisite oaths required by statute: and a jury is authorized to so find in the absence of proof to the contrary.

3. Proof that the "iron clad oath," required by the act of 1862 [12 Stat. 502], had not been deposited with the clerk of the district court will not negative such presumption, since it might lawfully have been deposited elsewhere.

4. Forty-eight hours is a reasonable time, under ordinary circumstances, to give a debtor arrested on execution, within which to procure a bond for his release before committing him to prison.

5. An averment in an indictment for resisting an officer, that defendant "did knowingly, wilfully and unlawfully obstruct, resist and oppose" the officer, sufficiently states the manner and method of the resistance.

6. In such case, an averment, that the execution which the officer is attempting to serve is in full force, is unnecessary, when that fact appears from the description of it; nor is it necessary to set out the process in hæc verba.

Indictment [against Henry Hudson] for resisting a deputy marshal in the service of an execution upon which a verdict of guilty had been rendered. Motion for a new trial for misdirection, and that judgment be arrested on account of a defective indictment.

Nathan Webb, U. S. Dist. Atty.

Josiah H. Drummond and Josiah Crosby, for defendant.

FOX, District Judge. The defendant, an attorney at law, resident at Guilford in the county of Piscataquis, having been found guilty of obstructing, resisting, and oppressing one H. A. Head, as a deputy marshal in the service of an execution from the district court against one Jona. H. Hall, now moves for a new trial and also in arrest of judgment.

Mr. Head was called by the government as a witness, and testified that two executions were placed in his hands for collection by Henry L. Mitchell, the creditor, one being against said J. H. Hall and the other against his brother Asher Hall, both of whom resided in the same house at Sawyerville, about six miles from Guilford; that his instructions were, to collect the executions or bring the debtors to Bangor, the jail there being used for the detention of prisoners resident in Piscataquis county, in which no jail is provided; that on 14th of January, he went to the Halls', saw Asher and informed him of his business; that Asher wished to consult with the defendant who was his attorney, and the Halls went that evening to Guilford and saw defendant; that afterwards the same evening he came to the public house where the Halls then were; that defendant then notified him the Halls had real estate which must be taken upon the executions and sufficient to satisfy the same, and that he was bound to levy upon real estate and could not arrest the debtors on the executions in such a case; that a written protest to this effect was drawn up by defendant

and signed by the Halls and given to him, Head; that defendant then threatened to sue and arrest Head if he should insist on holding the persons of the Halls upon the executions and taking them to Bangor, and thereupon he stated that he should insist on his rights, but would go to Bangor for advice; that he did so and again returned to Sawyerville on the evening of January 16, and told the Halls they must go with him to Guilford, which they did; that thereupon a complaint and warrant was procured by Hudson for the false arrest and imprisonment of the Halls by Head, which was returnable the next day before one Martin, the father-in-law of Hudson, who appeared as counsel against Head; that he was convicted and sentenced to pay a fine of $10 and costs, which not being paid a mittimus was issued for his committal to the jail at Bangor, to which city he was taken by the deputy sheriff as a prisoner; that while taking his breakfast at the public house at Bangor, and before being taken to the jail, the deputy sheriff was himself arrested on a warrant from Commissioner Rand, and Head was put in charge over him, having been detained as a prisoner under these proceedings before Martin more than four days.

Upon his direct examination, Head was not asked if he arrested J. H. Hall on the execution, but in reply to inquiries put on cross-examination he stated that the first night at the public house, as the Halls started to leave the parlor, Hudson said to him, "Do you consider these men arrested?" and he replied he did; that he touched Asher on the arm; that both the Halls left the room and he did not see them again that night; that he did not arrest or touch J. H. Hall nor recollect to have stated any thing different from what he has said about Asher.

The following question was then proposed by the counsel for defendant. "Did you not say, in your testimony before Commissioner Rand, that you would not state which one of the Halls you touched?" The question being objected to by the district attorney, was excluded, and for this cause a new trial is sought.

This ruling was in accordance with the decision of the supreme court of this state, in State v. Knight, 43 Me. 128, in which Tenney, C. J., says: "It has been regarded as an established rule, that a witness cannot be called upon to state his testimony, given on a former occasion, in a trial where the same evidence is relevant; and the authorities cited for the state sustain this rule." A careful examination of these authorities has not convinced me that they are quite so decisive of this point as the learned chief justice supposed; but the rule thus broadly laid down, whether sustained to the full extent stated by the authorities or not, has, as I understand, since been enforced in the courts of this state, and was frequently applied in cases within my own personal knowledge when I was at the bar. One case in particular is distinctly within my remembrance: upon the second trial of a civil cause, a witness was asked whether on the former trial she had not stated differently as a witness, and Mr. Justice Walton excluded the inquiry. Such has also been the uniform practice in this court for the past eight years, as upon objection, I have in repeated instances ruled in the same way, and so also has Mr. Justice Clifford, in the circuit court in this district, as I am well advised. If this question, therefore, is to be viewed as one of practice merely, then by act of congress of 1872. c. 255, § 5 [17 Stat. 197], this court is bound to adopt and conform to the state practice: but if it is matter of evidence, then by the same act, the court is not to depart from or alter the rules of evidence under the laws of the United States, and as practised in the courts thereof; and the exclusion of the evidence, being in conformity to the practice of the district and circuit court in this district, was correct.

It is claimed that in Knight's Case, the question put involved an inquiry as to testimony given by the witness before the grand jury; but the rule as stated by the chief justice is not so restricted, nor has it since been thus limited in its application, in the practice of the state or federal courts in this district.

In New York and some other states, it has been held, that such a question may be put to the witness, but that he can not be required to answer it, it being a personal privilege of the witness whether to answer or not, and that it is not for the party to the cause to interpose his objection; if this should be considered the better practice (and I am by no means clear that it is not) a court would not be justified in granting a new trial for the exclusion of a question, which a witness was under no obligation to answer, which in no way related to the subject matter of his direct examination, or tended to prove any material fact in controversy; but the only purpose and design of the inquiry could be, to discredit the witness. Bellinger v. People, 8 Wend. 595.

Judge Story in Re Marsh [Case No. 9,108], says: "The question is not whether the ruling on evidence and the directions given by the judge at the trial have been entirely correct, but whether, upon the whole case, the party moving for a new trial suffered any wrong or prejudice or injustice. The books are crowded with cases in support of this doctrine."

If the party, therefore, had at strict law a right to propound the question, it is equally certain he had no right to an answer, and he therefore certainly cannot claim he has suffered wrong or prejudice from its exclusion, especially when in the opinion of the court, there was not a material fact testified to by

Head in his examination in chief, which was not either admitted by the counsel for the defense, or established by the witnesses called by defendant: and the answer to the question thus excluded would have borne but very slightly, if at all, on the credit to be given by the jury to Head's testimony, which was abundantly sustained by other independent evidence. The party therefore was certainly not prejudiced by the exclusion of this inquiry.

It was also objected that Head was not duly qualified and authorized to act as a deputy marshal, it not being shown by any direct testimony, that he had taken and subscribed the oath prescribed by act of July 2, 1862, commonly called the iron clad oath. It was proved affirmatively, that he was in 1870 duly commissioned as a deputy by the marshal of Maine, and took the official oath required by act of Sept. 24, 1789 [1 Stat. 73], and that ever since he had constantly and notoriously acted in the discharge of the duties of a deputy marshal. The clerk of the district court testified that there was not upon the files in his office any evidence that Head had taken the oath of 1862; but no inquiry was made of Head, or the clerk of the circuit court, or of any other person in relation thereto. Upon this evidence the defendant requested the following instructions to the jury:

First: "That the jury must be satisfied beyond a reasonable doubt, that Henry A. Head was a deputy marshal of the district of Maine at the time of the service, or attempted service of the execution mentioned in the indictment."

Second: "That in order that he should be duly qualified, it should appear, that he had taken the oath prescribed by law in the act of congress of July 2. 1862; that there is no evidence presented that he has taken that oath, and therefore there is no sufficient evidence to prove, that he was a duly qualified deputy marshal."

Upon fully considering these requests, the court instructed the jury that it was necessary that they should be satisfied that Head was a deputy marshal, duly qualified and authorized to act as such, and that he had taken the oath prescribed by act of 1862, and that the commission to him as deputy marshal, with the fact that he had taken the oath required in the act of 1789, and his exercising and discharging all the duties of the office from 1870, if the same were all shown to their satisfaction, would justify the jury in finding the allegations in the indictment as to the official capacity of Head true and his qualifications established. without any further proof as to the iron clad oath having been administered.

The request called upon the court to instruct the jury, that there was no evidence that Head had taken the iron clad oath; but certainly, under the rulings of Judge Story, in U. S. v. Bachelder [Case No. 14,490], this

would have been erroneous, as in an indictment for resisting an inspector of customs, he told the jury, "that if an officer of customs be duly commissioned and found acting in the duties of his office, the law presumes that he has taken the regular oaths until the contrary is shown." These facts were all established in the present case. The commission to Head, his official oath, and his discharge of the duties of the office. were all admitted or not questioned; and the presumption, if any other oath was required, that it had been duly taken, would arise in his case. equally with that of an inspector of the customs. Com. v. Kane, 108 Mass. 423.

The government testimony adduced before the jury therefore established a full prima facie case of the qualifications of Head as deputy marshal, unless there is something in the nature and character of the oath itself prescribed by act of 1862. which calls for a different construction of the law; and a very extended argument has been presented, to satisfy the court that such is the nature of this oath; that its purpose was to exclude all rebels from any part in the administration of the government; that it required of all officers to bear witness that they had not given aid and comfort to the Rebellion, as well as to testify that they would remain loyal and true, and support the constitution and faithfully discharge the duties of their offices; that all other official oaths applied only to the future acts of the party, while this was a test of his former conduct and loyalty.

Conceding such to be the effect of the oath required by act of 1862, still the court does not perceive any good reason why a different presumption should arise, when one is found openly acting in the discharge of the duties of an office, relative to that oath having been taken, than did before arise. in relation to the oath required by the act of 1789. That act required that the marshal and his deputy, before entering on the duties of their office, should take and subscribe an oath faithfully to discharge the duties which appertain to it; and from the fact of one being found acting as a marshal with a proper commission. a presumption arose. according to the decisions, that the party had taken the oath which was required of him before entering upon the duties of his office. "Omnia præsumuntur rite esse acta donec probetur in contrarium" is applicable to all officers duly commissioned, and in the recognized discharge of the duties of their official positions, whether the official oath extends to their past lives, or to the faithful discharge of the duties of their offices in the future.

In the opinion of the court, a good deal more significance is given by the argument to this oath, than was ever contemplated by the act; undoubtedly it was designed to debar rebels from holding office. by requiring all to take the oath before entering on the duties of the office; but it immediately proceeds to declare,

that they shall take the oath "before being entitled to any salary or other emolument thereof," pretty clearly indicating that if they undertook to discharge the duties of the office before taking the oath, their official acts might be valid, but the consequence would be, that they would not be entitled to the salary or emolument; in no portion of the act, is it anywhere declared, that their official proceedings shall be void, if the oath is not first taken, or that the usual presumption is not to arise from their being found in the discharge of the duties of the office; but on the contrary, the rather suggesting that they might discharge the duties, if they would forego the emolument.

It is now claimed that the evidence from the clerk of the district court proved conclusively that the oath of 1862 had not been taken by Head, as it was not found on the files of the district court. As the court understands the instruction given to the jury, this testimony was not withdrawn from their consideration, although it was not distinctly brought to their notice by the court. The language of the charge was: "It is for the jury to determine as to the qualifications of Head, and from the testimony they would be justified in finding him qualified without further proof as to the iron clad oath having been administered to him." This submitted the question to them to decide, the court saying, that without any further proof that this oath had been administered, they would be justified to find him qualified; thus leaving it to the jury upon all the testimony, no instruction being asked for, as to the effect of the testimony of the clerk of the district court, or how far it should control the presumption, arising from the other facts and circumstances in the case.

If the testimony of the clerk of this court did however conclusively establish the fact, that Head had not taken the oath required by act of 1862, then the jury would not be justified in finding upon the whole evidence that Head was duly qualified, and the instruction should not have been given as it was, and the verdict would be against the evidence.

It is now claimed that the office of the clerk of the district court was the proper depository of the oath when taken, and that it should have been placed upon its files, and not being there demonstrates that it had never been taken by Head. This involves the construction of a provision, found in the act of 1862, which is as follows: "Said oath, when so taken and signed, shall be preserved among the files of the court, house of congress, or department to which the said office may appertain." Does the office of marshal or deputy marshal in Maine appertain to the district court of Maine? I am not satisfied that it does, any more than to the circuit court of Maine, or than it did to the department of the interior in 1862.

It is true, that by the acts of 1789 and of 1806, c. 21, the marshal, when duly commissioned by the executive, gave bond to the approval of the judge of the district court, which could be recorded in that court or upon the records of the circuit court.

The official oath, required by the act of 1789, c. 20, § 27 [1 Stat. 87], could, by act of 1799, c. 19, § 2 [Id. 625], be taken by a deputy marshal before the district judge, or if the deputy resided more than twenty miles from the district judge, it could be administered to him by a judge of the state court or a justice of the peace, and certified by him to the district judge; but beyond these provisions, I find none in any act of congress, which in any way recognize the marshal or his deputy, as appertaining to the district court of his district. These officers have no more to do with the district court than with the circuit court; they execute the process of either court, and the judge of the district or circuit court may, for good cause, remove a deputy marshal for misconduct. By the act of March 3, 1863, in case of a vacancy in office of marshal, the circuit judge may by writing appoint a marshal, and the person so appointed shall give bond to be approved by the circuit judge, which bond, with the written appointment of the marshal, shall be recorded on the files of the circuit court.

The district court has no authority to appoint a marshal or deputy marshal, and in my view it can not be said with any legal precision, that these officers appertain to the district court. If they appertain to either, it is rather to the circuit court, the judge of which court has the power of appointment of the marshal in case of a vacancy. The clerks of the courts and commissioners appointed by the respective courts may well be said to appertain to the several courts by which they are appointed, and to which they are amenable; but it is not so with the marshal and deputy marshal; if they appertain to the district court, they do to both, to the circuit equally with the district, and the oath in such case might as properly have been filed with the clerk of the circuit, as with the clerk of the district court; and a search therefore for a document in one of two places, in either of which it may be legally deposited, would not be sufficient evidence to prove its non-existence, as the presumption might well arise that it would be found in only one of the two places where it should be, and if not found in one, that it was in the other where it well might be. No search or inquiry having been made to ascertain whether such an oath was or not on the files of the circuit court, no presumption could arise that it was not there, and the evidence did not show that the oath in question had not been taken by the deputy.

The marshal, if he appertains to either branch of the government designated in the act, would, in my view, at the present time be considered as the rather appertaining to the department of justice, upon which is now conferred the authority over and supervision

of marshals, which in 1870 was vested in the interior department, and the oath should have been deposited there, instead of with the district court, and such is understood to have been in fact the practice in this behalf. There was therefore in the opinion of the court, upon all the testimony, sufficient to authorize the jury in finding that in all respects the marshal and his deputy were duly qualified and authorized to act as such officers, and that the averments in the indictment in relation thereto were established.

It appeared in evidence, that when at Guilford on the evening of January 14, Hudson asked Head if he had any blank bonds, and he told him if he would go to Bangor and fill out the bonds he would see that they were returned duly signed. Head replied he had no bonds, and that the parties would have to go to Bangor to have the bonds approved; and after this the protest of the Halls was served on Head; on the 16th nothing was said by either party about giving any bonds. The defendant requested the following instruction: "That by law Hall on being arrested by Head was entitled to the privilege of giving a bond to liberate himself from arrest, to be signed by sufficient securities to be approved by the creditor or by a commissioner of the United States; that he could not be expected to have made a bond ready at the moment of arrest, and that he was entitled to a reasonable time to procure it." Considering that the officer is under no obligation to provide a bond, and that the party had from the 14th to the 16th to procure a bond if he intended to avail himself of the provision of the act, if the instruction as a rule of law was correct, the case showed that a reasonable time had been afforded him to procure his bond and take it with him for approval to Bangor, where the creditor resided, as did also the nearest commissioner. I do not find from the testimony that Head ever claimed that his instructions went farther than to take the Halls to Bangor or get the money on the executions, or that he ever stated to them that he should commit them at once to the jail in Bangor on his reaching that place.

The requested instruction admits that Head might arrest the Halls on the execution, and only claims, that a reasonable time should be allowed to procure a bond, before their imprisonment in jail. In the opinion of the court, the forty eight hours which elapsed subsequently to the arrest, in connection with the further fact, that no bond was then offered, that no steps were shown to have been taken to obtain such bond, and no further time requested in which to procure the same, rendered the instruction improper under such circumstances, reasonable time being a matter of law when there are no facts in dispute.

The court in answer to this request read to the jury the various sections of chapter 113, Rev. St. of Maine, relative to arrest and imprisonment on execution, and stated to the jury, "that under these provisions, it was the duty of the officer having such instructions as Head had received, to arrest the debtor, and that when so arrested, the party had the privilege of giving bond without being imprisoned; that the officer was not obliged to purchase or furnish the bond, but that it devolved on the debtor; that when the arrest had once been made, the officer was bound to retain the prisoner in custody, and if he voluntarily allowed him to escape, he could not retake him on that execution, and that the officer was accountable to the creditor for the person of the debtor after his arrest; that in the discharge of the duties of his office, Head was bound to act impartially and without oppression, but that as the responsibility for the appearance of the debtor rested upon him, he had a right to exercise, fairly and honestly, his own discretion as to the means and place of the debtor's detention, even to the commitment to prison for the time being, if he should think proper so to do."

The argument presented by the learned counsel has not satisfied me, that these instructions were erroneous. It is clear that after the debtor is once arrested, the officer must retain him under his custody and control. In the present case, the officer at this time had under arrest both the Halls, and also one Randall; he was forty miles from prison and from the residence of the creditor and commissioner, and I am not aware of any provision of law, which would justify him in detaining and confining his prisoners in the house of any third person, or that would require a third party to act as keeper over them at his request. Jails are provided by law for the detention of prisoners, and when placed therein the deputy is exonerated from the care and custody of his prisoners, and not before. The law no where declares that any certain period of time shall be granted the debtor after his arrest in which to furnish his bond, and that in the mean time, he shall remain in the custody of the officer, without being liable to commitment to prison for safe keeping. The only provision on the subject is that in section 24, c. 113, Rev. St., which says, "When a debtor is arrested or imprisoned on execution he may be released by giving bond." The legal effect of which is, that if he is prepared to give bond before his imprisonment, he is not to be committed; but if the bond is not forthcoming on his arrest, then he may afterwards be released from imprisonment on procuring such bond. While it is usual for the officer to afford the debtor, upon his request, facilities for procuring the bond after arrest, without subjecting him to being imprisoned, I can find no provision of law which makes it obligatory upon him so to do, and if he attempts to imprison the debtor, justifies him and his counsel in obstructing, resisting, and opposing the officer in the dis-

charge of his official duties. It is for the officer to determine whether he shall imprison the debtors for safe keeping, and with these prisoners in his custody at this time, I think he would have been justified in so doing, and that they would have had no legal cause of complaint if he had actually committed them to jail, or intended so to do, which is not made certain, as his only orders from the creditor was to bring the debtors to Bangor, and being there, an opportunity for an adjustment would be afforded, which could not be had if they remained at their own homes without intercourse with their creditor.

The motion in arrest is also overruled. The first cause assigned is, that the averment made in the indictment, "that he did knowingly, willfully and unlawfully obstruct, resist and oppose the said H. A. Head," is not sufficient; that the manner of the resistance, &c., should be set forth.

It is sufficient for this court to find that Mr. Justice Story in U. S. v. Bachelder [Case No. 14,490], has declared that the averment found in this indictment is sufficient, and that further particularity and precision is not requisite. This opinion of Judge Story is fully sustained by Judge Washington in U. S. v. Lukins [Id. 15,639]. In that case there were two counts in the indictment, one for resisting and opposing the officer, being a deputy marshal, and the other for an assault. The judge in his opinion fully sustains the first count, which is not set forth in the report. I have obtained from the files of the circuit court of Pennsylvania a copy of the first count, which is in the same general language as that objected to in the present case, being simply that the defendant "willfully and knowingly did resist and oppose an officer of the United States, &c.," without any averment or allegation as to the character of the resistance.

The present indictment sets out at full length a copy of the execution which Head had in his hands for service, which bore date Dec. 10, 1873, and was returnable the first Tuesday of Feb., 1874. The objection is taken that it is not stated in the indictment that the execution was in full force; that it might have been paid although issued only thirty-five days before the arrest. It was enough to say that on the face of the proofs, the officer had for service, a valid lawful precept, which it was his duty to execute, and which the defendant had no right to resist or oppose. The officer was fully justified by his process, and that is distinctly shown by the averments in the indictment, and by the full recital therein of the execution; this was more than the law required, as it is not necessary to set out in hæc verba the process under which an officer is acting, but it is sufficient so to describe it as to identify it and inform the respondent of what he is called to answer. State v. Roberts, 52 N. H. 492. Motions overruled.